**SEALED**

**FILED**
AUG 8 - 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

<u>Statement of the Offense</u>
<u>United States v. Simon P. Kareri, 05-212 (RMU)</u>

Simon P. Kareri was a Senior Vice President in Riggs Bank's International Banking division in Washington, D.C. Kareri's work focused on countries in the African Caribbean regions. As part of his job duties, Kareri managed Riggs Bank's business relationships with certain Riggs foreign governments and foreign customers from certain African countries. In his capacity as Senior Vice President, defendant Kareri had broad authority over the bank accounts he managed on behalf of Riggs including, but not limited to, the power to approve wire transfers of funds from customer accounts. As a senior officer of Riggs Bank, Kareri occupied a fiduciary position of trust, confidence and obligation at Riggs, and in performing his duties for Riggs, Kareri owed Riggs the fiduciary duties of fidelity, honesty, loyalty, and care.

Kareri and his wife Ndeye Nene Fall Kareri ("Fall") lived in Silver Spring, Maryland.

Riggs Bank prohibited conflicts of interest and self-dealing by bank employees. Specifically, the Riggs Bank Code of Ethics:

- expressly directed bank personnel to "avoid representing the Bank in any transaction, whether with a person or business organization in which a staff member or any member of his or her immediate family has a material connection or a substantial financial interest";
- strictly prohibited bank employees from borrowing money from bank customers;
- stated that "Staff members and their immediate families are not to solicit or accept any personal benefits from any customer of the Bank . . . .";
- "No staff member shall engage in any transaction with the understanding that all or part of the anticipated payment is to be used for any unlawful or improper purpose. No secret or non-recorded fund may be established or maintained for any purpose."

Kareri was well aware of these prohibitions. Riggs Bank required all of its employees, including defendant Kareri, to certify annually in writing that they had read the Riggs Code of Ethics and were in compliance with it.

Kareri also knew that Riggs Bank was periodically examined by federal bank examiners to assure that it was operated in a safe and sound manner and in conformity with applicable laws and regulations. The Office of the Comptroller of the Currency ("OCC") had primary supervisory authority over Riggs Bank and defendant Kareri in his capacity as senior vice president of Riggs Bank. The OCC could impose sanctions on Riggs if it found that Kareri violated the bank officer's fiduciary duty of loyalty to the bank.

Between 2000 and 2004, Kareri, in his capacity as an officer at Riggs Bank and for the self-enrichment of himself and Fall, participated in personal business transactions with Riggs

Bank customers whose accounts Kareri managed. Kareri and Fall took affirmative steps to conceal these transactions from Riggs Bank because they knew that these transactions were expressly prohibited by Riggs and the OCC. Kareri and Fall's participation in these transactions exposed Riggs to risk of harm and loss.

*Activities related to the remodeling of the Benin Embassy*

Kareri, in his capacity as Senior Vice President of Riggs, maintained a bank account for the embassy of Benin. Kareri was in charge of Riggs Bank's business relationship with Benin.

The Embassy of Benin and other embassies maintained bank accounts at Riggs Bank that defendant Kareri supervised. Pursuant to defendant Kareri's recommendation, and without Riggs Bank's specific knowledge or consent (though he often did handle customer's personal or business affairs such as this with the bank's knowledge), the Embassy of Benin ~~and other embassies~~ entered into business relationships with Hardutt Singh to perform remodeling services on their properties. In or about January, 2000, Defendant Kareri instructed Singh to provide defendant Kareri with an initial estimate for the work on the Benin Embassy. In February, 2000, Singh provided Kareri with an initial estimate of approximately $186,000 for a major renovation of the Benin Embassy in Washington, D.C. Kareri then instructed Singh to inflate the final invoice Singh submitted to Benin to $410,000, of which Kareri demanded that Singh return $224,000 to Kareri.

Singh, through subcontractors, performed the work on the Benin Embassy. The Benin Embassy issued checks from their Riggs Bank accounts made payable to Singh for the full inflated price – accounts defendant Kareri managed on behalf of Riggs. Between April 8, 2000, and September 6, 2000, Singh then delivered a total of $224,000 (in 4 separate checks) to Kareri at Kareri's office at Riggs Bank in Washington, D.C.

*Kareri's creation and use of Jadini Holdings, Ltd.*

From 1996 to 2004, defendant Kareri, in his capacity as Senior Vice President of Riggs, opened and maintained numerous bank accounts for the government of Equatorial Guinea. Kareri also opened and maintained bank accounts for various EG senior government officials, and their family members including the EG President, Teodoro Obiang Nguema Mbsago ("Obiang") and Obiang's son, Teodoro Nguema Obiang ("Nguema").

On May 9, 2001, Kareri established an offshore shell corporation in the Bahamas known as Jadini Holdings Ltd. for the purpose of handling his personal business transactions with Riggs customers. Defendants established Jadini through Trident Trust Services in Atlanta, Georgia. Fall was President of Jadini. The business address for Jadini listed in the incorporation documents was defendants' home address in Silver Spring, Maryland. On July 3, 2001, Fall opened bank account numbers 700265279 and 700265260 at SunTrust Bank in the name of Jadini Holdings Ltd. ("the Jadini accounts"). Fall was listed as President of Jadini Holdings Ltd.

Between July, 2001, and March, 2002, Kareri caused the transfer of approximately $1,096,677.60 of monies from Riggs Bank accounts owned and controlled by the government of Equatorial Guinea to SunTrust Bank Jadini accounts owned by defendant Kareri, including the following transactions:

(1) On July 5, 2001, Kareri caused the wire transfer of $700,000 from Riggs account # 17164642 held by the government of EG to Fall's Jadini account;

(2) On July 5, 2001, Kareri caused the wire transfer of $329,926 from Riggs account # 17164642 held by the government of EG to Fall's Jadini account;

(3) On March 20, 2002, Kareri caused the wire transfer of $66,751.68 from Riggs account # 17164642 held by the government of EG to Fall's Jadini account.

Kareri and Fall established and used Jadini to conduct defendant Kareri's prohibited business activities with Riggs customers over whose accounts Kareri had supervision.

### *$140,000 check to Bolly Ba*

In a separate series of transactions, Kareri and Fall used a family friend, Bolly Ba, to conceal that Kareri was obtaining monies from an account owned by the EG president's son. The EG president's son had given Kareri a check for $40,000 as a gift which Kareri knew violated bank policy. On November 28, 2003, Kareri and Fall gave Bolly Ba a check made payable to Ba in the amount of $140,000 drawn off the Riggs account of Nguema, the son of the President of EG. Kareri supervised this account in his capacity as Senior Vice President of Riggs. On November 30, 2003, Ba, acting at Kareri's direction, deposited Riggs check #301 into Ba's bank account and wrote a check made payable to defendant Fall in the amount of $139,000. On December 8, 2003, Fall deposited this $139,000 into her bank account at Chevy Chase Bank. On December 15, 2003, Fall transferred $130,000 from her Chevy Chase Bank account # 004-334251-5 to Chevy Chase certificate of deposit # 027-695084-4 owned by Fall.

Kareri and Fall solicited Ba's involvement and used Fall's maiden name and bank account to wilfully conceal from Riggs Bank defendant Kareri's prohibited business activities with Riggs customers over whose accounts Kareri had supervision. In order to further conceal these transactions, Kareri and Fall wrote letters to Riggs EVP David Caruso in which they falsely advised Caruso that the money was a loan to Ba for Section 8 housing. Ba also wrote a similar letter to Caruso at Kareri's direction. On January 13, 2004, Fall withdrew from her Chevy Chase Bank account # 004-334251-5 $130,000 in order to reverse the transaction to make it appear legitimate.

### *Impeding the lawful functions of the IRS*

In an effort to conceal Kareri's activities from Riggs Bank and the Internal Revenue

Service, Kareri and Fall failed to report any of these proceeds as income on their federal tax returns.

Kareri and Fall filed joint income tax returns with the Internal Revenue Service for the tax years 2000, 2001, and 2002. Kareri and Fall signed and filed their 2000 income tax return under penalties of perjury. Kareri and Fall electronically filed their 2001 and 2002 income tax returns using an individual PIN number to electronically submit the returns under penalties of perjury.

During 2000, Kareri received checks from Hardutt Singh, at least some of which was income. Kareri and Fall did not, however, report the proceeds of these checks as income on their 2000 tax return.

Between July, 2001, and March, 2002, Kareri caused the transfer of certain monies from Riggs Bank accounts owned and controlled by the government of EG to SunTrust Bank Jadini accounts owned by Kareri and Fall. At least some of this was income that Kareri and Fall should have reported on their 2001 and 2002 federal income tax returns. Kareri, aided and abetted by Fall, established and used Jadini to wilfully conceal income from the United States Internal Revenue Service.

During the period between 2000 and 2003, Kareri and Fall wilfully and knowingly attempted to evade a substantial part of the income taxes due and owing. Kareri and Fall understated their income on their joint income tax returns for the calendar years 2000, 2001, and 2002. During the period between 2001 and 2003, Kareri and Fall wilfully and knowingly agreed to make and subscribe individual federal tax returns which contained and were verified by written declarations that they were made under penalties of perjury, and which the defendants did not believe to be true and correct as to every material matter.

### *Impeding In Rem Jurisdiction*

On July 9, 2001, Kareri and Fall purchased a parcel of land located at 11310 South Glen Road, Potomac, Maryland, for a purchase price of $575,000 (the "Defendant Property"). On September 2, 2004, the United States filed a civil forfeiture complaint *in rem* against the Defendant Property in the United States District Court for the District of Columbia, Civil Action Number 04-1525 (RMU). The United States District Court for the District of Columbia issued a warrant of arrest *in rem* against the Defendant Property on September 29, 2004, and the warrant was served out of the District of Columbia on the Defendant Property on September 29, 2004. The United States placed a lis pendens on the property as well.

Kareri and Fall were put on notice that the United States had filed a civil forfeiture action against the Defendant Property. On October 15, 2004, both Kareri and Fall filed separate, verified "Statement[s] of Interest" in the United States Court for the District of Columbia, Civil Action 04-1525, in which each defendant indicated that he or she was "the co-owner of the

property which is the subject of this forfeiture action." On January 10, 2005, Kareri and Fall, through their counsel, jointly moved to have the civil forfeiture case filed against the Defendant Property (Civil Action 04-1525) stayed pending the outcome of a criminal investigation into their activities, of which they were then aware. In or about March, 2005, the Clerk of the Court for Montgomery County removed the lis pendens from the property. This action did not, however, have any impact on the pending forfeiture case against the property.

On May 6, 2005, Kareri and Fall sold the Defendant Property for $1,075,000 while the forfeiture case remained pending, but stayed. On May 6, 2005, Kareri and Fall requested a check for the proceeds of the sale of the property and left the closing with a check made payable to Kareri and Fall in the amount of $999,315.62. Kareri and Fall caused, immediately thereafter, the transfer by wire proceeds from the sale of the Defendant Property outside the jurisdiction of the United States, into a foreign bank account that Fall opened for the purpose of that transfer.

On May 6, 2005, and in a course of conduct continuing thereafter, in the District of Columbia and elsewhere, Kareri, aided and abetted by Fall, knowing and having received notice that the Defendant Property was the subject of a lawful seizure proceeding in the United States District Court for the District of Columbia, and in order to prevent and impair the authorized seizing and securing of Defendant Property by the United States, sold Defendant Property to a third party and transferred the proceeds of that sale outside the jurisdiction of the United States.

I have read this Statement of the Offense and I agree that it accurately sets forth a relevant portion of my involvement in this offense. I have reviewed it with my attorney, Jonathan Shapiro, Esq.

_____
SIMON P. KARERI, Defendant

_____
JONATHAN SHAPIRO, ESQ.
Attorney for Simon P. Kareri