UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | Criminal No. 05-212-01 (RMU) |
| | : | |
| | : | **(UNDER SEAL)** |
| **SIMON P. KARERI,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

**GOVERNMENT'S MOTION FOR DOWNWARD
DEPARTURE AND MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, moves for a downward departure of two levels pursuant to the United States Sentencing Guidelines section 5K1.1 and submits this memorandum in aid of sentencing.

I. Background

On August 8, 2005, defendant Kareri pleaded guilty to counts 1-6, 13-18, 20 and 24 of the grand jury indictment charging him with conspiracy, bank fraud, money laundering, and conspiracy to defraud the IRS. In addition, defendant Kareri also pleaded guilty to impairing the in rem jurisdiction of the Court. This charge stems from Kareri's efforts to liquidate real property that was the subject of a forfeiture proceeding and then transfer that money to an overseas bank account. Defendant Kareri agreed to a set of stipulated facts.

Defendant Simon P. Kareri ("Kareri") was a Senior Vice President in Riggs Bank's International Banking division in Washington, D.C. Kareri's work focused on countries in the African/Caribbean regions. As part of his job duties, Kareri managed Riggs Bank's business relationships with certain Riggs foreign governments and foreign customers from certain African

countries. In his capacity as Senior Vice President, defendant Kareri had broad authority over the bank accounts he managed on behalf of Riggs including, but not limited to, the power to approve wire transfers of funds from customer accounts. As a senior officer of Riggs Bank, Kareri occupied a fiduciary position of trust, confidence and obligation at Riggs, and in performing his duties for Riggs, Kareri owed Riggs the fiduciary duties of fidelity, honesty, loyalty, and care.

Riggs Bank's Code of Ethics and Prevailing Banking Industry Regulations

Riggs Bank prohibited conflicts of interest and self-dealing by bank employees. Specifically, the Riggs Bank Code of Ethics:

- expressly directed bank personnel to "avoid representing the Bank in any transaction, whether with a person or business organization in which a staff member or any member of his or her immediate family has a material connection or a substantial financial interest";

- strictly prohibited bank employees from borrowing money from bank customers;

- stated that "Staff members and their immediate families are not to solicit or accept any personal benefits from any customer of the Bank . . . .";

- "No staff member shall engage in any transaction with the understanding that all or part of the anticipated payment is to be used for any unlawful or improper purpose. No secret or non-recorded fund may be established or maintained for any purpose."

Riggs Bank required all of its employees, including defendant Kareri, to certify annually in writing that they had read the Riggs Code of Ethics and were in compliance with it.

Equatorial Guinea ("EG") is a country approximately the size of Maryland on the west coast of Africa. In 1995, billions of dollars of oil reserves were discovered within EG territorial waters, resulting in a significant influx of capital from businesses in the United States and elsewhere. From

in or about 1996 to in or about 2004, defendant Kareri, in his capacity as Senior Vice President of Riggs, opened and maintained numerous bank accounts for the government of EG.  Kareri also opened and maintained bank accounts for various EG senior government officials, and their family members including the EG President, Teodoro Obiang Nguema Mbsago ("Obiang") and Obiang's son, Teodoro Nguema Obiang ("Nguema").

Benin is a country approximately the size of Maine on the west coast of Africa.  Defendant Kareri, in his capacity as Senior Vice President of Riggs, opened and maintained a bank account for the embassy of Benin.  Kareri was in charge of Riggs Bank's business relationship with Benin.  H.S., a resident of Virginia, had experience as a construction contractor and, from time to time, performed construction services for the Embassy of Benin and other embassies and embassy officials.

On or about May 9, 2001, defendant Kareri established an offshore shell corporation in the British Virgin Islands known as Jadini Holdings Ltd. ("Jadini") for the purpose of concealing his personal business transactions with Riggs customers.  The business address for Jadini listed in the incorporation documents was defendants Kareri's and Fall's home address in Silver Spring, Maryland.  On or about July 3, 2001, defendant Fall opened bank account numbers xxxxxx5279 and xxxxx5260 at SunTrust Bank in the name of Jadini ("the Jadini accounts").  Fall was listed as President of Jadini.

Defendants Kareri and Fall carried out the conspiracy using the following manners and means, among others:

    a. The Embassy of Benin and other embassies maintained bank accounts at Riggs Bank that defendant Kareri supervised.  Pursuant to defendant Kareri's recommendation, and without Riggs Bank's knowledge or consent, the Embassy of Benin and other embassies entered into business relationships with H.S. to perform remodeling services on their properties.

3

b. In or about January, 2000, Defendant Kareri instructed H.S. to provide defendant Kareri with an initial estimate for the work on the Benin Embassy. In or about February, 2000, H.S. provided defendant Kareri with an initial estimate of approximately $186,000 for a major renovation of the Benin Embassy in Washington, D.C.

c. In or about February, 2000, Kareri instructed H.S. to inflate the final estimate H.S. submitted to Benin to $410,000, of which Kareri demanded that H.S. return $224,000 to Kareri.

d. The Benin Embassy issued checks from their Riggs Bank accounts made payable to H.S. for the full inflated price – accounts defendant Kareri managed on behalf of Riggs.

e. H.S. delivered the portion of the proceeds that defendant Kareri demanded to Kareri at Kareri's office at Riggs Bank in Washington, D.C. As defendant Kareri well knew, his participation in these transactions was a direct violation of Kareri's fiduciary duty of loyalty to Riggs Bank and exposed Riggs to risk of loss and harm.

f. On or about May 9, 2001, defendants Kareri and Fall established Jadini through Trident Trust Services in Atlanta, Georgia. Defendant Kareri registered Jadini in the British Virgin Islands. Defendant Fall was listed as President of Jadini in order to conceal defendant Kareri's financial interest in Jadini.

g. On or about July 3, 2001, Fall opened two bank accounts at SunTrust Bank in the name of Jadini.

h. Between in or about July, 2001, and in or about March, 2002, from his office at Riggs Bank in Washington, D.C., defendant Kareri caused the transfer of approximately $1,096,677.78 of monies from Riggs Bank accounts owned and controlled by the government of Equatorial Guinea to SunTrust Bank Jadini accounts owned by defendants Kareri and Fall.

     i. Defendants Kareri and Fall established and used Jadini to wilfully conceal from Riggs Bank defendant Kareri's prohibited business activities with Riggs customers over whose accounts Kareri had supervision. As defendant Kareri well knew, his participation in these transactions was a direct violation of Kareri's fiduciary duty of loyalty to Riggs Bank and exposed Riggs to risk of loss and harm.

     j. Defendant Kareri enlisted the assistance of third persons to conceal monies that Kareri obtained from Riggs customer accounts that were under his supervision. For example, on or about November 28, 2003, defendant Kareri gave B.B. a check made payable to B.B. in the amount of $140,000 drawn off the Riggs account of Nguema, the son of the President of EG. Defendant Kareri supervised this account in his capacity as Senior Vice President of Riggs.

     k. On or about November 30, 2003, B.B., acting at defendant Kareri's direction, deposited Riggs check #301 into B.B.'s bank account and wrote a check made payable to defendant Fall in the amount of $139,000.

     l. On or about December 8, 2003, defendant Fall deposited this $139,000 into her bank account at Chevy Chase Bank.

     m. Defendants Kareri and Fall solicited B.B.'s involvement and used Fall's maiden name and bank account to wilfully conceal from Riggs Bank defendant Kareri's prohibited business activities with Riggs customers over whose accounts Kareri had supervision.

     n. In an effort to conceal defendant Kareri's prohibited activities from Riggs Bank and banking regulators, defendant Kareri made false statements to Riggs Bank.

     o. In an effort to conceal defendant Kareri's activities from Riggs Bank and the Internal Revenue Service of the United States Department of Treasury (IRS), defendants Kareri and Fall failed to report any of these proceeds as income on their federal tax returns.

p.  As defendant Kareri well knew, Kareri's receipt of funds from Riggs Bank customer accounts without Riggs's knowledge or consent was a direct violation of Kareri's fiduciary duty of loyalty to Riggs Bank and exposed Riggs to potential regulatory sanctions and other risk of loss and harm.

II.  Sentence

Pursuant to the plea agreement, the parties agree that the total adjusted offense level is 21 for defendant Kareri which yields a term of imprisonment of 37-46 months.  The PSR concurs with this.  See PSR para. 45.  There are therefore no contested issues that the Court must resolve concerning the application of particular Guideline provisions or the calculation of defendant's offense level.

Based on defendant Kareri's cooperation with the government's ongoing criminal investigation of Riggs Bank and other related matters, the government moves for a two level downward departure pursuant to U.S.S.G. sec. 5K1.1.  Law enforcement officials met with Kareri on at least six separate occasions while he was in custody at the D.C. Jail.  Kareri's cooperation yielded useful information in two principal areas.

First, Kareri, as a Riggs SVP and insider, was able to provide information concerning the conduct of other senior bank officials.  By way of background, Riggs Bank entered a corporate criminal plea in January, 2005, for wilful violations of the Bank Secrecy Act, specifically, its wilful failure to file suspicious activity reports on accounts managed by Kareri.  Prior to Kareri's arrest in May, 2005, the government had few true bank "insiders" who were willing to provide unfiltered information about individual bank employees.  Kareri gave his best effort to disclose what he knew but the information did not reflect a criminal knowledge or intent that would support charges against

6

other bank officials. The information was, however, useful to law enforcement in that it enabled the government to bring finality to the issue of whether the it could successfully prove whether senior Riggs officials had individual guilty knowledge and intent.

Second, Kareri assisted the government in its Foreign Corrupt Practices Act investigation in Equatorial Guinea. Kareri met with law enforcement officials multiple times and he directed agents to specific account records maintained by Riggs that reflected payments to EG officials. Kareri's information was accurate and corroborated by the documents. The government is now in the process of determining whether there is sufficient evidence to charge any individuals or organizations in connection with this information. Kareri's knowledge has assisted the government in asking the right questions. Kareri's information was helpful in pointing law enforcement officials in the right direction and pointing the government to specific records that document payments. Kareri's information is, however, presently of limited usefulness and therefore no more than a two level departure is appropriate here which would put defendant's offense level at 19 and yield a term of imprisonment of 30-37 months.[1]

III. Restitution

As set forth in the PSR, para. 100, the Court should order defendant Kareri to pay $224,000 in restitution to the Republic of Benin. This amount represents the money that defendant Kareri appropriated from Benin by directing H.S. to inflate the invoices that H.S. provided to Benin. The specific facts underlying this conduct and supporting this restitution figure are outlined in Count One

---

[1] Defendant Kareri should of course receive credit for the time he has already served pending his guilty plea and sentencing between May, 2005, and March, 2006.

of the Indictment, paras. 10-13, 18(a)-18(e) and 19(1)-19(4). In connection with his plea of guilty to Count One of the Indictment, defendant signed and adopted under oath a written factual proffer setting forth these specific facts. See Simon P. Kareri Statement of Offense filed 8/8/05.

Also, defendant Kareri is jointly and severally liable for $522,534.41[2] in restitution to the Internal Revenue Service for taxes and penalties due and owing as a direct result of his plea to Count 20 of the Indictment in which he admitted to entering into a conspiracy with his wife to defraud the IRS. This figure is based on the total amount of unreported income that defendant Kareri had in 2000, 2001, and 2002. See Ex. 1, attached hereto. In 2000, defendant failed to report $224,000 in income that he received from H.S. In 2001, defendant failed to report a total of $1,041,498 in income he received from Equatorial Guinea that was wired into the Jadini Holdings account that he and his wife controlled. In 2002, defendant failed to report $85,365.68 in income he received from Equatorial Guinea that was wired into the Jadini Holdings account that he and his wife controlled.

In order to derive the amount of tax due and owing on this additional income, it is necessary to add the omitted income to the income Kareri reported on his returns to come up with the total income numbers. See Ex. 1. Next we deduct the itemized deductions and exemptions because some of Kareri's deductions and exemptions were limited in full or in part because his income exceeded a certain amount. Now we have the total corrected taxable income from which we can calculate the correct amount of tax due and owing. See id. Finally, we subtract the tax defendant had reported

---

[2] This figure is higher than the $436,893.44 set forth in para. 100 of the PSR. The higher figure takes into account additional income attributable to defendant that the PSR did not include.

in his returns from the tax calculation (to give him credit for the tax he already paid) and we are left with the additional tax due and owing which is reflected as the last line on Exhibit 1 and aggregates to $522,534.41.

IV. <u>Conclusion</u>

For the foregoing reasons, defendant Kareri should be sentenced within the Guideline range for offense level 19 and ordered to pay restitution as set forth above. The government does not oppose a sentence at the bottom of the range for offense level 19.

        Respectfully submitted,

        KENNETH L. WAINSTEIN
        UNITED STATES ATTORNEY
        D.C. BAR # 451946

By:   _____
        STEVEN J. DURHAM
        ASSISTANT UNITED STATES ATTORNEY
        555 Fourth Street, N.W.
        Room 5253
        Washington, D.C. 20530
        (202) 514-8316

**CERTIFICATE OF SERVICE**

I certify that I have provided a true copy of the forgoing Government's Motion and Memorandum in Support to the following parties by telecopier:

Jonathan Shapiro, Esq.
(counsel for defendant Simon P. Kareri)
FAX 703-684-9017

on this 9th day of August, 2006.

_____
STEVEN J. DURHAM
ASSISTANT U.S. ATTORNEY