UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

        -vs-                                    Criminal No. 05-212-01 (RMU)
                                                     **UNDER SEAL**

SIMON P. KARERI

## DEFENDANT'S POSITION ON SENTENCING

SIMON P. KARERI, by counsel, submits this position paper on sentencing in this case.

Simon Kareri is before the court for sentencing, fifteen months after pleading guilty to charges of bank fraud, money laundering, conspiracy to defraud the IRS, and impairing the *in rem* jurisdiction of this court. Kareri, 49, father of seven year-old Andrew and ten year-old Esther, husband to Nene Kareri, had never been in trouble before. He had worked for 11 years at the Guardian Federal and Perpetual Banks, and for the past ten years at Riggs. He was raising his family in suburban Maryland. Since his arrest, he served nearly ten months in the D.C. Jail, cooperated fully with the United States, and then was released on pre-trial supervision six months ago (eight months by the time of sentencing), with the agreement of the United States.

Background of the Case

Kareri's crimes arose from his employment at Riggs, and to understand how they came about, it is important to have a little background on that bank and Kareri's role there. The culture among top officials at Riggs left much to be desired, and attracted the attention of bank regulators and investigators who undertook a major investigation into

Riggs' broad failure to comply with banking laws. From public reports, including a report of a Senate investigation into Riggs' practices, many top officials at Riggs had routinely helped influential customers move and hide money in violation of the anti-money laundering laws. See Hearing Before the Permanent Subcommittee on Investigations of the Committee on Government Affairs of the United States Senate, July 14, 2004 ("the Subcommittee Report"), specifically noting the various illegal practices engaged in by the bank for the benefit of General Pinochet, and the receipt of large deposits from U.S. oil companies for the benefit of Equatorial Guinea officials and their families. Mr. Kareri had been Riggs' man in charge of the E.G. accounts.

     It is not the intent of this pleading to shift focus away from Mr. Kareri's crimes, or make excuses for them. No excuses are offered. As has been and will be seen, Kareri accepts full responsibility for his acts, and has cooperated fully with the United States. Evidence of that cooperation is the government's motion to reward Kareri by reducing his sentence pursuant to U.S.S.G. §5K1.1.  Nevertheless, for the sake of context, it is noteworthy that many at Riggs were engaged in, at the very least, a willful blindness to the consequences of their business practices, and that Riggs as an institution turned a blind eye and condoned practices which did not meet banking regulations and laws.[1]

---

[1] One need only look at the exasperated questioning of Riggs Officials at the Senate Hearing to understand the institutional failings by Riggs and many of its agents. The following is by Senator Levin, questioning Ashley Lee, Executive Vice President and Chief Risk Officer for Riggs, and Raymond Lund, Former Executive Vice-President, International Banking Group, Riggs:

     Just a few questions on General Pinochet. It is a pretty sordid tale. A series of non-actions on the part of the bank which did not comply with your own self-stated policy and with what the regulations were relative to Know-Your-Client at the time.

2

This is what the summary is. You solicited General Pinochet's business. Senior officers of the board were aware that he was a client. The bank established two off-shore shell corporations in a secrecy jurisdiction for Pinochet where his name could not be traced to the entities, those entities being Ashburton and Althorp corporations. Due diligence on General Pinochet's accounts was virtually non-existent. When you look at the Know-Your-Customer forms for the offshore entities, you just find almost no identifying information whatsoever of any value.

There were no documents which showed Pinochet's source of wealth when he opened his personal account in your bank in 1994. When Pinochet opened an account for one of his offshore corporations, that I referred to, in 1996, the Know-Your-Customer form was not even filled in for two years. The original source of wealth was described as "family wealth, high-paying position in public sector for many years." The source used to verify the source of funds was listed as "position and wealth are a matter of public knowledge," and boy, they sure were.

By 1998, there was a Riggs account opened for a second off-shore entity called Althorp. The Know-Your-Customer form was not filled in until May 1999. That is a year later, after the account was opened. Original source of wealth is just simply listed as "family and salary." No checking out of the source.

You were still trying to obtain documentation of Pinochet source of wealth when the OCC was conducting its exam in 2002, and all that was written there was by the head of Riggs international private bank component writing a memo which said the process of collecting definitive documentation of the source of funds "continues." When Riggs tried to move the offshore corporation to another jurisdiction, you were unable to do so because you could not answer the jurisdiction's questions about the source of the funds.

You omit the fact, in your Know-Your-Customer forms, that there was ongoing international litigation against Pinochet including efforts to freeze his funds. The identity of Mr. Pinochet is excluded from both the Ashburton and Althorp Know-Your-Client forms, and the fact that he was associated with two offshore corporate accounts was kept in a vault.

Now this one quick question. Mr. Lund, you were head of the international banking group. How could you have allowed all those Know-Your Customer requirements to be so thoroughly ignored?

Mr. Lund: Senator, I believe that the individuals that were directly involved with the relationship received the proper training from the bank. They knew the requirements, and I believe that I was entitled to rely on internal and external audits to reveal deficiencies in the documentation.

  Senator Levin: Riggs changed the name of Pinochet's personal account from Augusto Pinochet Ugarte – this is in December 2000 – to A. Ugarte. Why did you do that?

  Mr. Lund: Senator, I don't recall that I was aware that that happened.

Hearing Before the Permanent Subcommittee, July 15, 2004 at 26-27.

  As to E.G., the top leadership of Riggs was similarly situated:

  Senator Levin: I just have one question for Mr. Herbert, something which just has been troubling me, and I think the only way to address it is to ask you this question. This relates to President Obiang in Equatorial Guinea.

  We got a State Department report, public report, issued in February 2001. Now, this is just before you had lunch with the President of Equatorial Guinea. And this State Department report is highly critical of the Equatorial Guinean Government. It says that "The investment and other uses of oil revenues lack transparency, despite repeated calls in previous years from international financial institutions and citizens for greater financial openness. Lack of public transparency in national finances has undermined the country's economic potential. Little evidence is apparent that the oil wealth is being devoted to the public good. The government's human rights record remained poor and continued to commit serious abuses."

  Within weeks, a month or so after this report is out, you and the leadership of the bank have lunch with this man who everyone knows is a dictator. By the way, in 2003 and 2004 Washington Post editions of Parade magazine, one of the world's 10 worst dictators is President Obiang. He is on the front cover with the other ones, including Castro and, 2003, Saddam Hussein and North Korea's dictator and a few other choice leaders like that. They say that Obiang is "in permanent contact with the Almighty" and "can decide to kill without anyone calling him to account."

  This is a pretty visible guy out here now, OK? Now you have lunch with him and you are obviously soliciting his business. Then you write a letter May 17, signed Robert Albritton, Larry Herbert, Timothy Coughlin, president of Riggs, and Kareri, the man who was here before. And you say:

  "Dear Mr. President, We hope this letter finds you well and rested after your trip to Washington. We would like to thank you for the opportunity you granted us in hosting a luncheon in your honor here at Riggs bank. We sincerely enjoyed the discussions. We formed a committee of the most senior officers at Riggs that will meet regularly to discuss our relationship. We are confident we can be of great assistance to you by providing you access top the best financial expertise both at Riggs and within the entire financial services industry. We are also confident that, together, we can reinforce your

4

It was within this world that Kareri's acts – *which no one forced him to commit* – took place. Kareri was not a renegade banker within the confines of the settled Riggs world. Rather, the culture at Riggs, established at the very top, was to get business done for its clients.

In that regard, the court should know that in his employment at Riggs, Mr. Kareri served as much more than a typical bank employee looking after the banking issues of his customers. With the approval and encouragement of Riggs, Kareri became very involved in many of his clients lives. He took care of them when they visited Washington. He made travel arrangements for them. He traveled to E.G. to consult with them. He distributed money to their children. He established and administered a program to help fund the education of children of his clients in the United States. He advised them on purchases. Much of this was done with the approval of Riggs officials who were glad to have the enormous wealth of E.G. at their institution.[2]

It is also important to focus on what Kareri's criminal conduct here was and what it was not. With the exception of the tax fraud counts and the impairment of *in rem* jurisdiction count, Kareri's conduct had to do with his actions at the bank and his relationships with E.G. and its officials, and the officials of another country. All those

---

reputation for prudent leadership [ ] and administration as you lead Equatorial Guinea into a successful future. Thank you for the opportunity to assist you. With gratitude."

*Id*. at 39-40.

[2] The Statement of the Offense in this case notes, for example, in speaking of Kareri's hiring of Mr. Singh to perform remodeling services for the Embassy of Benin, "Pursuant to defendant Kareri's recommendation, and without Riggs Bank's specific knowledge or consent *(though he often did handle customer's personal or business affairs such as this with the bank's knowledge)*, the Embassy of Benin entered into business relationships with Hardutt Singh to perform remodeling services on their properties." Statement of the Offense at page 2 (emphasis added).

acts are subsumed in the Count 1 conspiracy to commit bank fraud, wire fraud and deprivation of honest services. At the plea colloquy in this case, counsel for Mr. Kareri made it explicit that the charges are founded on a theory of liability which requires that a bank employee not breach a duty of loyalty to his employer. The United States agreed.

Thus, the Indictment recites that "A goal of the conspiracy was for the defendants KARERI and FALL to unlawfully enrich themselves by KARERI engaging in prohibited personal business transactions with Riggs Bank customers in which KARERI had a financial interest without the knowledge or consent of Riggs Bank." See Indictment at 6, para. 7 ("A Goal of the Conspiracy"); Indictment at 5, para. 16(a) ("The Conspiracy") (Kareri conspired "to defraud Riggs Bank" by "engaging in prohibited personal business transactions with Riggs Bank customers . . . ."). Kareri's liability thus fits well into the recognized theory that the harm a fraud causes need not be "deprivation of tangible property or money; criminal fraud encompasses schemes to defraud persons of intangibles as well." *United States v. Sun Diamond Growers of California*, 964 F. Supp. 486, 492 (DC 1997). The court there referred to the D.C. Circuit's opinion in *United States v. Lemire*, 232 U.S. App. D.C. 100, 720 F.2d 1327, 1337 (1983), summarizing its holding that the "failure to disclose a conflict of interest to an employer which in knowledge or contemplation of the employee poses an independent business risk to the employer" is sufficient to sustain wire fraud or bank fraud liability. *Id*. at n.16.

So, just by way of example, the most prominent of the acts to which Mr. Kareri has pleaded guilty involved the establishment of the Jadini account in Maryland, and the transfer to that account of over $1 million. See Indictment, p. 7, paras. (f) through (i). It is alleged that this was a breach of his duty of loyalty to Riggs, not that the money was

6

stolen. Kareri was using that account to transact personal business with E.G. The transactions had to do with the building of a road in E.G., and the construction of a cold storage facility there, projects which Kareri had both advised E.G. on, and in which he had a personal business interest, in violation of bank policy.

<u>The Guideline Range, *Booker,* and a "Reasonable Sentence"</u>

The guidelines in this case have been calculated, both by the parties and by the probation officer, at Level 24. Minus three levels for Acceptance of Responsibility, the resulting Level is 21, with a guideline range of 37 – 46 months.

As part of the plea agreement in this case, the defendant agreed that he would not seek a downward departure for any reason from the otherwise applicable guideline range. See plea letter to counsel August 8, 2005, para. 3. Counsel and Mr. Kareri intend to live by that agreement. *United States v. Booker*, 543 U.S. 220 (2005), established that the United States Sentencing Guidelines are advisory only, however, and that sentencing courts were free to impose sentences below the otherwise applicable guidelines.

Seeking a sentence below the established guideline range is not the same as seeking a downward departure from the guideline range. See, for example, *United States v. Arnaout*, 431 F.3d 994, 1003 (7th Cir. 2005) ("the concept of 'departures' has been rendered obsolete in the post-*Booker* world."); *United States v. Muhamed*, __ F.3d __ (9th Cir, 8/11/06), 2006 U.S. App. LEXIS 20585, *19 ("We think the better view is to treat the scheme of downward and upward 'departures' as essentially replaced by the requirement that judges impose a 'reasonable' sentence.").

Counsel believes that a "reasonable" sentence in this case is below the advisory guidelines, and so asks the court to consider such a sentence here, for the reasons set forth

7

below. However, to the extent the court believes that Mr. Kareri is precluded by his plea agreement from arguing for a sentence lower than the guidelines, counsel wishes to make clear that we have no intent to violate the terms of that agreement and so will stand by the court's view of it.

Putting aside the government's motion for a downward departure, a sentence of 37 – 46 months is too severe given Kareri's conduct, the context of the offenses, and the factors set out in 18 U.S.C. §3553 which the courts look to to determine reasonable sentences. That section commands that the court shall not impose a sentence greater than necessary to (A), reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B), to afford adequate deterrence to criminal conduct; (C), to protect the public from further crimes of the defendant; and (D), to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Application of the §3553 Factors

The §3553 factors overlap to some extent, and Mr. Kareri's circumstances as well do not fit neatly into single categories, so no attempt will be made to separate factors.

The main component of the defendant's conduct (though not the sole component) was a breach of his duty of loyalty to a bank. That bank itself was running amuck (as footnote 1 makes clear) [3], and embraced and encouraged the kind of personal involvement provided by Kareri, a fact which is entitled to some consideration in evaluating his loyalty breach. The defendant's money laundering offense consisted of depositing the money involved in his business dealings with clients into the Jadini

---

[3] For whatever reasons, the principals of that institution have avoided criminal charges though it seems to counsel that they were engaged in egregious conduct.

8

account. Taxes on the portion of that money which was income to the defendant were not paid, the basis of the tax counts.

The defendant was also charged with the offense of impairing the court's *in rem* jurisdiction. This was a serious offense and was an affront to the court. In considering how that act fits into the sentencing calculus, however, counsel asks the court to consider that Kareri, who had been speaking to the government through counsel for perhaps nine months prior to being charged and arrested and who was becoming more and more desperate, simply caved in to the very poor judgment which can flow from intense stress. This of course is no justification for what he did.

He paid dearly for that lapse. As a result of his actions, he and his wife were swiftly arrested. His home was left in turmoil, his children left without warning to the care of relatives who struggled to take on the added responsibilities. Kareri was denied bond for more than nine months. He quickly signed documents at the request of the United States in order to facilitate the return of the money. The money involved was then recovered.

In short, the court's swift action and Kareri's sudden loss of family, and his anguish over what he had done to his children, was significant punishment. It was quite different than what would have befallen Kareri had he worked out a plea agreement, cooperated, been released pending sentencing, and could plan for his children. He has, of course, no one but himself to blame for what happened. Nevertheless, what happened went a long way towards achieving all the retributive goals of §3553. The court's action reflected the seriousness of the offense, promoted respect for the law, and provided quick and just punishment for the offense.

As additional punishment, and as a direct result of his acts, Kareri's family now subsists on the meager wages of his wife, approximately $200 per week, and support from relatives. He has accumulated significant debt while searching unsuccessfully for a job in his field. Despite months looking for work, he has now given up any hope that he will ever be employed in that field, and has struggled with his wife to start a small food company, Tropica Foods LLC, which, it is hoped, will distribute his wife's homemade foods to grocery stores. Kareri reports that he now walks two miles to the Metro to travel because gas has become a luxury. As the Pre-Sentence Report notes, he takes only half the prescribed dosage of medication for his ulcerative colitis, and is now applying for free medication through a drug company program because he cannot afford to purchase it.

Additionally, though not countable towards any period of incarceration the court may impose, Mr. Kareri has been supervised by the High Intensity Supervision Program of Pre-Trial Services for the past six months (eight months by the time of sentencing), and has been on home detention that entire time. He has been completely compliant, even calling Pre-Trial when his home periodically lost power for fear that his monitoring bracelet would be affected. He has never missed an appointment with Pre-Trial. While not technically punishment, the fact of his complete compliance is something the court can weigh in deciding how much punishment is yet needed to deter, to protect and to punish.

The court certainly hears of circumstances like this frequently, many times from those who have not had the advantages that Mr. Kareri has had. But it remains true nonetheless that he has suffered significant punishment, and further lengthy incarceration will exact a toll – on Kareri and on his family – beyond that necessary under §3553.

Counsel also notes that after serving over nine months in the D.C. jail, the government agreed not to oppose Mr. Kareri's request to be released on personal recognizance pending sentencing. This came after a series of meetings with the government in which Kareri shared all his information about various targets, and during which the government became convinced that Kareri could be trusted. Kareri's efforts, and the fact that the government came to trust him, bear in some measure on the issues of rehabilitation and the need to protect society from Kareri, one of §3553's factors, and thus on what punishment needs yet to be imposed.

Kareri's nearly ten months in the D.C. Jail was difficult, which is as it should be. Kareri faced difficulties not shared by others, though, in that he frequently did not receive necessary medication for his intestinal condition, a condition which had required hospitalization for an extended period in the time before his arrest.

Finally, in weighing what punishment is necessary under §3553 to protect the public, the court may look to evidence of the defendant's character. This court did not have the benefit of hearing testimony about Mr. Kareri from friends and family members at the time of his initial detention hearing. We have attached the brief testimony given by Nene Ndong (the defendant's goddaughter), Anne Ganness (the defendant's sister), and James Mbuthia (the defendant's brother), who were just a few of the many people who attended that hearing, as well as the proffer of testimony from Elizabeth Ollo (a friend), and Katherine Njuguna (the defendants' sister) (attached as Exhibit B). While directed to the issue of risk of flight, their testimony (and the proffer) shows Mr. Kareri to be a beloved family leader with strong feelings about his adopted country.

Also attached are letters from a number of friends and professional associates, including:

>James K. Mukira
>CIS/Economics Professor (Exhibit C)
>
>Crecy C. Tawah
>Minister, Cameroon Diplomatic Corps   (Exhibit D)
>
>Martin Wuno
>Businessman  (Exhibit E)
>
>John Meyer
>Mediator  (Exhibit F)
>
>Gideon Akunji
>Pharmacist and Pharmacy owner  (Exhibit G)
>
>Kovi Sedjro
>Businessman  (Exhibit H)
>
>Carrie Crawford
>Attorney  (Exhibit I)
>
>R. Bruce McColm
>Institute for Democratic Studies  (Exhibit J)

The majority of these writers remark on the same several salient facts – Kareri accepts responsibility for his acts, he bears no bitterness towards others for what has happened to him, he loves his family and his country, and he simply wishes to return to a normal life. The writers also note the profound impact Kareri's incarceration has had on his young children and his wife.

<u>Government's Motion for Downward Departure</u>

In recognition of Kareri's value to the government's investigation of others, the government has recommended that the court depart downward by two Levels, to Level 19, with a sentencing range of 30 – 37 months, a reduction of 19%, low-end to low-end.

Of course, once the government makes such a motion, the court is free to decide the extent of any downward departure.

Counsel accompanied Mr. Kareri to each of his five debriefing sessions. The first occurred on June 6, 2005, two months before his guilty plea. The others were on August 10, August 31, October 27 and December 1. Each lasted several hours. In addition, when Kareri was able to recall facts of potential interest to the government, he called counsel who then passed the information on to the Assistant United States Attorney.

The government credits Kareri with giving his best efforts to aid the government, both in its inquiry concerning Riggs, and in its inquiry concerning the Foreign Corrupt Practices Act investigation, specifically, dealings by major oil companies and others with the government of Equatorial Guinea. Kareri's information, though useful, did not lead to any further prosecutions of bank officials, though it did help the government decide whether the use of further investigative resources was worthwhile. The FCPA investigation is ongoing. Kareri was able to give the United States specific information about specific individuals, and about highly suspicious specific payments made by major companies to E.G.

This was a major case which involved significant government resources. That Kareri's information helped close the case on some targets seems to counsel to be just as useful as had his information resulted in prosecutions. As the only cooperating "insider", he was able to save the government time and resources. That his cooperation was earnest and complete is also indicative of the person he has become since his arrest.

For whatever value it may have, it does appear that nationally, the median percent decrease from the guideline minimum in cases in which the United States seeks a

"Substantial Assistance" departure pursuant to 5K1.1 is 99% in fraud cases, 64% in money laundering cases, and 100% in tax cases. See United States Sentencing Commission, *2005 Sourcebook of Federal Sentencing Statistics*, Table 30, attached hereto as Exhibit A. While those facts may not have much value in and of themselves, it is also worth noting that overall, for all crimes including murder, kidnapping, robbery, arson, drugs, etc., **the median percent decrease for substantial assistance departures was 50%.**

Sentencing Recommendation

The government recommends a sentence of 30 months. With good time credit, that sentence equates to approximately two years and two months. With time served already, that sentence becomes one of approximately 16 months. We submit that whether as a result of *Booker*, or of §5K1.1, or a combination of the two, a Zone B sentence of an additional 12 months home confinement is reasonable. This is real additional punishment yet a punishment which allows Kareri to care for his children. In the alternative, we ask the court to consider a sentence in Zone C which could be up to 16 months, with some amount of incarceration (which can be as low as five months and which can be "community confinement"), credit for time served, and the balance in home confinement, as well as a term of supervised release.

The Issue of Tax Liability

There is no question that Mr. Kareri owes some amount of taxes. We respectfully disagree with the government's claim that the amount owed is $522,534.

The government's figure would likely be accurate if all the money involved in this case was income. But it was not. This is evidenced to some degree in the Statement

of Facts in this case which notes, at page 4, that "Between July, 2001 and March, 2002, Kareri caused the transfer of certain monies from Riggs Bank accounts owned and controlled by the government of EG to SunTrust Bank Jadini accounts owned by Kareri and Fall. *At least some of this* was income that Kareri and Fall should have reported on their 2001 and 2002 federal income tax returns." (emphasis added). Kareri maintains that a significant amount of money deposited to the Jadini account was not income at all, but money expended by E.G. for services paid for by Kareri. Apparently officials from E.G. have confirmed to the Senate investigators that at least part of this money was authorized by that government to be paid out by Kareri. See Subcommittee Report at 172. Without doubt, some of the money in Jadini was income and without doubt, Kareri does owe the United States taxes.

The court may be aware that as part of the agreement in this case, the parties stipulated that the issue of what monies would be forfeited as a result of this criminal case would be decided in the pending, though stayed, civil forfeiture action. See plea letter of August 8, 2005, at para. 5.[4]

Counsel suggests that since this court will eventually be hearing the civil forfeiture case which involves the *identical* issues in dispute here, it simply makes sense to defer the issue of tax liability and restitution until the matter of what is and is not

---

[4] Paragraph 5 reads, in part:

Forfeiture: Except as noted in the following paragraph, this agreement does not encompass the forfeiture action filed by the United States against certain property in civil case number 04-1525, presently pending before this Court. The United States and Mr. Kareri remain free to take any position regarding this action.

15

illegally obtained money, and income, is litigated in the civil forfeiture matter.[5] The defendant waives any and all objections he could make to the delay in the imposition of the forfeiture amount as part of his sentence in this criminal case.

                                        Respectfully Submitted
                                        SIMON KARERI
                                        By Counsel

---

[5] The restitution identified by the probation officer is for $225,000 claimed to be owed to Benin. Counsel understands, however, that Benin has not claimed any loss from Kareri's conduct.

Counsel for the Defendant:

_____
Jonathan Shapiro
Law Office of Jonathan Shapiro, P.C.
910 King Street
Alexandria, Virginia   22314
(703) 684-1700
Admitted Pro Hac Vice


_____
Christopher G. Hoge
DCB # 203257
Crowley, Hoge and Fein, P.C.
1710 Rhode Island Avenue, N.W.
Suite 700
Washington, D.C.   20036
(202) 483-2900

Local Counsel


## Certificate of Service

I hereby certify that a true copy of the foregoing motion was mailed this \_\_th day of September, 2006, to Steven Durham, Assistant United States Attorney, 555 4th Street, N.W., Washington, D.C., 20530.

_____
Jonathan Shapiro