UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 05-212-01 (RMU) |
| | : | |
| | : | **(UNDER SEAL)** |
| SIMON P. KARERI, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**GOVERNMENT'S REPLY TO DEFENDANT SIMON
KARERI'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, files the following reply to defendant Simon Kareri's memorandum in aid of sentencing. As set forth in the government's initial sentencing memorandum, a sentence of 30-37 months in prison is eminently reasonable for the crimes defendant committed here. There is no principled reason to sentence Mr. Kareri to anything less. And, for the reasons set forth below, the Court should decline defendant's invitation to defer its imposition of restitution that is properly due and owing to the defendant's victims in this case.

I. Defendant's sentence

In addressing defendant's arguments he sets forth in his sentencing memorandum, one overriding fact is germane and should control the Court's decision making on the length of defendant's sentence: in entering his plea of guilty before the Court, Mr. Kareri agreed to the applicability of a specific Guideline level and agreed not to seek any reductions in the base offense level or any downward departures.[1] To be sure, the government does <u>not</u> contend that by seeking

---

[1]  Paragraph 3 of the signed plea agreement states as follows:

a so called <u>Booker</u> departure that he is reneging on the terms of his plea agreement. The fact that Kareri *agreed in advance* to the adjusted offense level and essentially agreed that no reductions in that level or downward departures were appropriate, however, gives him only the slimmest of platforms on which to seek a <u>Booker</u> departure.

The Guideline sentence set forth in the plea agreement is highly reasonable under the circumstances here. Since the time of his plea, the government has moved for a two level downward departure under section 5K1.1 which would reduce defendant's adjusted offense level even further if granted and makes his sentence all the more reasonable. Defendant's reliance on section 3553(a)'s factors offers him little refuge. Indeed, given defendant's wide array of crimes[2], the Court could

---

3. **<u>Federal Sentencing Guidelines</u>:** The parties agree that the following Guideline Sections apply:

| | |
|---|---:|
| (a)  Base Offense Level (2B1.1) | 7 |
| (b)  Specific Offense Characteristics | |
|         Loss more than $400,000 | 14 |
| (c)  Obstruction of Justice (3C1.1) | 2 |
| (d)  Money Laundering (2S1.1(b)(2)(A)) | 1 |
| | |
| TOTAL | 24 |

<u>Your client agrees not to seek any decreases in your client's base offense level other than those which are agreed to by the Government in this paragraph. Your client further agrees not to seek a downward departure for any reason from the otherwise applicable guideline range established by the Sentencing Guidelines.</u>  (emphasis added.)

[2]    Defendant seems overly focused on casting disproportionate blame on the corporate culture which prevailed at Riggs Bank during his tenure. <u>See</u>, e.g., Def. Mem. at 1-5, 8. In Kareri's world view, his multiple conspiracies, bank fraud, money laundering, tax offenses and purposeful impairment of the Court's *in rem* jurisdiction can all be traced back to the prevailing dysfunctional corporate environment at Riggs. The inherent flaw in this thinking, however, is that <u>none</u> of the crimes to which Kareri pleaded guilty involved criminal violations of the Bank Secrecy Act which was Riggs's criminal offense. Kareri's decision to commit multiple criminal offenses against multiple victims (including Riggs itself) simply cannot be placed at the feet of the bank.

easily exceed the advisory Guideline range in order to reasonably achieve the objectives set forth in section 3553(a). For example, just with respect to defendant's purposeful obstruction of the Court's *in rem* jurisdiction (count 24), there is an acute need for the sentence to adequately deter others from doing what defendant did, i.e., liquidating assets that are the subject of a forfeiture proceeding before the Court and deliberately placing those assets beyond the reach of the Court. This conduct defeats the whole purpose of a forfeiture action and, without the period of incarceration prescribed by the Guidelines, would be an inappropriate temptation to others. Moreover, defendant's flagrant breach of trust as a senior bank official undermines the public confidence in the U.S. banking system and the prescribed punishment – incarceration – reflects the seriousness of the offense and promotes respect for the law.

      As principal justification for a sentence outside the Guideline range that he agreed to, defendant points to the personal hardships visited upon him and his family members. See Def. Mem. at 9-11. These collateral consequences – while undoubtedly burdensome and sad – do not, however, distinguish Kareri from the hundreds of other federal inmates who populate the correctional system in the United States. What is apparently lost here is the fact that the litany of negative consequences are all entirely self-inflicted wounds. Cf. United States v. Dyce, 91 F.3d 1462, 1468 (D.C. Cir. 1996) (pre-Booker) ("The unfortunate fact is that some [parents] are criminals; and, like it or not, incarceration is our criminal justice system's principal method of punishment. A term in jail will always separate a [parent] from [their] children. . . . [Defendant] 'has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison

3

sentences normally disrupts . . . parental relationships . . ..'") (citations omitted).  No one forced Kareri – who rose to become a senior vice president of a well known bank in the capital of the United States – to commit these offenses and place his family in harm's way.

The Court should impose the sentence prescribed by the Guidelines.

II. Restitution and Forfeiture

In his sentencing memorandum, Kareri takes issue with the government's calculation of the amount of restitution he owes the Embassy of Benin and the Internal Revenue Service.  Kareri's argument raises two separate issues: first, Kareri mistakenly believes that restitution and criminal forfeiture are identical and interchangeable concepts; second, Kareri disputes the *amount* of restitution he owes but offers no evidence to rebut the government's showing in its sentencing memorandum.  We will address each issue separately.

A. Restitution and criminal forfeiture are distinct concepts.

Defendant's argument – that the restitution and forfeiture hearings should be deferred and rolled into one consolidated proceeding (see Def. Mem. at 14-16) – is misplaced.  The Court should, as part of sentencing in the criminal case and as part of the judgment and commitment order, impose an order of restitution on defendant in order to compensate his victims for his criminal conduct.

It is well established "that forfeiture and restitution are not mutually exclusive; rather, they each serve separate and distinct goals." United States v. O'Connor, 321 F. Supp.2d 722, 729 (E.D. Va. 2004).

> Specifically, forfeiture generally serves to remove from an offender the fruits and instrumentalities of his crime, and thereby provides a powerful disincentive to commit the crime in the first instance.  An order of restitution, on the other hand, serves primarily to compensate victims for any losses suffered as a result of a defendant's criminal activity.  Because forfeiture and restitution serve distinct goals,

a defendant generally has no right or entitlement to use forfeited funds to satisfy an additional restitution obligation. Put another way, amounts that are forfeited by a defendant to the United States are not typically available to pay whatever criminal monetary penalties are imposed upon that defendant. This is so, in part, because rightful ownership of forfeited funds vests in the United States at the moment the triggering forfeiture act occurs.

Id. (citations omitted).

Despite these general principles, it is clear that the government may, in appropriate circumstances, agree to restore or assign forfeited proceeds to the victims of the underlying criminal conduct. See id. As part of the forfeiture action in this matter, the United States has seized monies that are the subject of the civil case 04-1525 pending before the court.[3] To be clear, the government is not seeking any type of double recovery here. If the Court orders restitution in this matter, the government will pay the victims from the funds it has already seized from Kareri. As a procedural matter, however, the Court should make a finding with respect to restitution at defendant's sentencing in the criminal case and incorporate that finding in defendant's judgment and commitment order.

B. Amount of restitution

Pursuant to the Mandatory Victim Restitution Act, the Court is required to order restitution to "identifiable victims . . . [that have] suffered . . . a pecuniary loss." 18 U.S.C. sec. 3663A(a)(1), (c)(1)(B). Kareri owes restitution to two identifiable victims, the Embassy of Benin and the Internal Revenue Service.

---

[3] This includes the repatriated proceeds – now in the Court's registry – that Kareri obtained from the sale of land in Montgomery County, Maryland that was the subject of the government's original forfeiture action. Defendant entered a guilty plea to count 24 of the indictment which charged him with the wilful obstruction of the Court's *in rem* jurisdiction over this property when he sold the property and transferred the proceeds of that sale to a bank account in Luxembourg.

1. Embassy of Benin

In his memorandum, Kareri, in a two sentence footnote, suggests that somehow the Embassy of Benin is not truly a victim based on Kareri's unsupported assertion that Benin has not claimed any loss as a result of his criminal misdeeds. Def. Mem. at 16, n.5. Kareri does not make clear what, if anything, a victim must do to claim loss.

In any event, the issue is irrelevant to the Court's determination of restitution here. The immutable fact is that Kareri instructed the contractor to inflate the contractor's final invoice the the Benin Embassy by $224,000. The contractor followed Kareri's directive and submitted a false invoice to Benin and caused Benin to pay $224,000 in excess of what it would have legitimately cost the Embassy had Kareri not been dishonest.[4] The contractor delivered four checks to Kareri totalling $224,000 which Kareri deposited into accounts he controlled. Kareri does not – and cannot – dispute these facts because he agreed to them as part of his plea. See Statement of Offense filed 8/8/05 at 2. There is simply no way to explain away Benin's status as a victim of Kareri's fraud.[5] Benin should be compensated for its loss and conversely, Kareri should not benefit from his ill gotten gain.

2. Internal Revenue Service

---

[4] To be clear, Kareri was never entitled to any type of "broker's fee" here. Kareri was a full time employee of Riggs Bank at the time he instructed the contractor to inflate the invoice. In his position at the bank, Kareri was in charge of the bank's business relationship with Benin and occupied a position of fiduciary trust.

[5] It is also worth noting that inasmuch as Kareri may suggest others shared some criminal culpability for this fraud on Benin, an order of restitution imposes joint and several liability. See United States v. Nucci, 364 F.3d 419, 422 (2d Cir. 2004) ("It has long been the law of this circuit that the restitution obligation may be ordered to be joint and several.")   It is clearly within the district court's discretion to order that Kareri, who pleaded guilty to a conspiracy to commit this offense, be held jointly and severally liable for the full amount of the restitution.

As part of his guilty plea, Kareri admitted that he and his wife defrauded the IRS by wilfully failing to pay taxes due and owing on income. While acknowledging that he owes the United States taxes, Kareri disputes the government's assessment of his income during the years in question. See Def. Mem. At 14-16. As set forth in the government initial sentencing memorandum, Kareri's tax liability is based on income he and his wife received but never reported or paid taxes on.

Again, it is useful to refer to the facts to which Kareri agreed at the plea hearing. Kareri agreed that he received four checks payable to him totaling $224,000 from the contractor in connection with his inflated invoice to the Benin Embassy. See Statement of Offense at 2. There is no evidence that defendant was holding this money as a custodian for someone else and defendant proffers no information to the contrary. This is clearly unreported income and has been properly included in the government's tax liability calculation.

With respect to monies Kareri and his wife received in the Jadini Holdings account, defendant maintains that "a significant amount of money deposited to the Jadini account was not income at all, but money expended by E[quatorial] G[uinea] for services paid for by Kareri." See Def. Mem. at 15. Defendant does not specify what a "significant amount" is. The government's position has been to count *all* of the money that defendant received in the Jadini Holdings account as unreported income. The undisputed fact is that Kareri created Jadini Holdings as an offshore shell corporation in the Bahamas for the purpose of concealing his unlawful business transactions with Riggs customers. See Statement of Offense at 2. Because Jadini was an entity used to advance

defendant's criminal activity, the government contends that any monies received by Kareri in the Jadini account – whether retained personally by Kareri or passed through to a third party – is income and should be taxed accordingly.[6]

                                                Respectfully submitted,

                                                JEFFREY A. TAYLOR
                                                UNITED STATES ATTORNEY
                                                D.C. BAR # 498610

By: _____
       STEVEN J. DURHAM
       ASSISTANT UNITED STATES ATTORNEY
       555 Fourth Street, N.W.
       Room 5253
       Washington, D.C.  20530
       (202) 514-8316

---

[6] There do appear to be certain payments from the Jadini account to third parties for services that arguably could have been rendered for Equatorial Guinea. These payments total approximately $170,000. If the Court determines that defendant's income should be reduced accordingly, defendant's 2001 income would be adjusted downward to $870,572.42 which would yield an aggregate corrected tax liability of $455,702.34 (as opposed to the $522,534.41 figure set forth in the government's initial sentencing memorandum).

**CERTIFICATE OF SERVICE**

      I certify that I have provided a true copy of the forgoing Government's Reply to the following parties by telecopier:

Jonathan Shapiro, Esq.
(counsel for defendant Simon P. Kareri)
FAX 703-684-9017

on this 5th day of October, 2006.

                                                _____
                                                STEVEN J. DURHAM
                                                ASSISTANT U.S. ATTORNEY